IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF ALASKA

AFFIDAVIT OF SPECIAL AGENT RIKK RAMBO

I, Rikk Rambo, a Special Agent with the Drug Enforcement Administration (DEA), being first duly sworn on oath, depose and say:

**Background and Experience of Affiant**

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2. I am currently employed as a Special Agent of the U.S. Drug Enforcement Administration ("DEA") assigned to the Anchorage, Alaska District Office. I have been assigned to the Anchorage District Office since April, 2004. Prior to this, I served as a DEA Special Agent in Pittsburgh, PA, Yakima, WA, and with the Caribbean Field Division on the island of St. Croix. I have personally participated in numerous investigations involving illegal drug distribution, and I also have reviewed reports of investigations concerning these offenses, which were prepared by Special Agents of the DEA and other law enforcement agencies.

3. I have specialized training and experience in the investigation of drug trafficking. I have participated in numerous drug and gang investigations as a case agent and in a subsidiary role. I have also participated in the debriefing of a significant number of defendants, informants, and witnesses who had personal knowledge regarding major drug trafficking organizations. Additionally, I have participated in many aspects of drug and gang investigations, including conducting surveillance and conducting court-ordered interceptions of wire communications. I am familiar with drug traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of drug, the collection of money that represents the proceeds of drug trafficking, and money laundering. I am aware that drug traffickers often communicate with their drug-

trafficking associates through the use of cellular telephones and digital display paging devices. I am also familiar as to the manner in which drug traffickers transport and distribute drug in areas they control.

4. I know that synthetic cannabinoids, often referred to as synthetic marijuana or "spice," as listed in the Synthetic Drug Abuse Prevention Act of 2012 of the Controlled Substances Act (21 U.S.C. § 812), are Schedule I controlled substances. I know that spice is illegal and is often imported into the United States in large quantities from points located in Mexico and China, repackaged in small quantities once it is smuggled into the United States, and commonly sold to consumers through smoke shops and gas stations. For the purposes of this affidavit, the term "spice" is used to refer to the listed Schedule I controlled substances and their analogues, as specified in 21 U.S.C. § 813.

5. The information in this affidavit is based on my personal participation in this investigation and knowledge obtained from investigative reports, conversations with, and a review of reports generated by, state, local and federal law enforcement officials. This affidavit is intended to show that there is probable cause for the requested search warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter.

6. I have conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, cocaine hydrochloride, cocaine base (crack), PCP, heroin, methylenedioxymethamphetamine (MDMA/ecstasy), methamphetamine, prescription medications, firearms, cellular telephones, surveillance systems, cameras, memory cards, computers, documents, bulk currency, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

7. Based upon my training, experience and participation in these and other

financial/drug trafficking investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

a. In my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

b. I know that in United States v. Terry, F.2d 272 (9th Cir. 1990), United States v. Angulo-Lopez, 791 F.2d 1394,1399 (9th Cir.1986), United States v. Hernandez-Escargega, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in United States v. Fannin, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in United States v. Cardoza, 769 F. 2d 625, 630 (9th Cir. 1985) that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c. It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession sale and distribution of

drugs and the collection and transportation of drug proceeds. I also know that the aforementioned books, records and ledgers etc., are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s).

d. It is common for members of drug trafficking organizations to conceal in their residences and businesses in strong boxes, safes, lock boxes, concealed compartments and hidden rooms, large quantities of US currency, foreign currency, financial instruments, precious metals, jewelry, and other items of value which are proceeds from drug trafficking.

e. I know that evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves are evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes documentation of these assets in their vehicles or businesses.

f. It is common for members of drug trafficking organizations to utilize wire transfer companies, (i.e. Western Union, MoneyGram) to facilitate the movement of US currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee senders to disguise the origination of the funds and to break up the amount being sent by any one person. I know that the actual owner of the currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name, intended pay-out location and amounts of money to be sent. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee senders to maintain copies of the wire transfer receipts, amounts sent and tracking numbers. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles.

g. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of US currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with hand-written information concerning the intended recipients name and account number and amounts of money to be deposited. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug trafficker's and/or nominee depositor's residence, businesses, or vehicles.

h. It is common for members of drug trafficking organizations to utilize express parcel delivery companies, (i.e. Federal Express, United Parcel Service, DHL, and US Postal Service Express Mail) to facilitate the movement of controlled substances and US currency throughout the trafficking organization's area of operations. I also know that, in an attempt to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers. I know that members of drug trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name and address. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles.

i. It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I also know that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the aforementioned items are frequently

maintained in the drug trafficker's residence, businesses, or vehicles.

j. It is common for drug trafficking organizations involved in the purchase, dilution, and repackaging of controlled substances for distribution to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time, even when they do not have any controlled substances on hand. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business. I have also found scales and packaging materials in traffickers' vehicles.

k. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or US currency throughout the trafficking organization's area of operations. I know that often times the couriers handler will provide the courier with hand-written notes regarding travel itinerary, hotel information and contact telephone numbers prior to the courier departing on the trip to transport drugs and/or money. I also know that often times the organizations will pay a flat rate (i.e. $2,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, often times the couriers will keep handwritten itemized lists of expenses and/or receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the courier's residence or residences and vehicles of members of the drug trafficking organization.

l. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business.

m. It is common for members of drug trafficking organizations to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from

Page 6 of 16

law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities.

n. It is common for members of drug trafficking organizations to possess firearms and ammunition to protect their drugs, assets, and persons from rival traffickers, other criminals, and from law enforcement.

o. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, business, or vehicles.

p. It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug traffickers will also utilize the purchase/sale of real estate to legitimize their profits. I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, or vehicles.

q. It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income. It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper. I also know that these records and documents are frequently maintained in the drug trafficker's residence or business.

r. The statutory provisions to which the current investigation relates include; (1) Title 21, U.S.C., Section 841 (a) (1) and 846, the Distribution of Controlled Substance,

the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations, and (2) Title 18 U.S.C. Section 1956, Money Laundering, and conspiracies to do the same and aiding and abetting the same. I am familiar with the provisions of these statues and based upon my training and experience, I believe that the items described in this affidavit and which are sought by this application for search warrant are fruits, evidence and instrumentalities of violations under Title 21, U.S.C., Section 841 (a) (1) and 846 and Title 18 Section 1956.

## INTRODUCTION

### A. Summary

8.      This investigation is directed towards efforts by the Juneau-based retail stores known as "Mystik Treasures" to sell spice and its analogues and to further promote and conceal that activity and the source of the funds through monetary transactions.

### B. Purpose of Application

9.      I make this affidavit in support of an application for the execution of a Federal Search Warrant at the specific locations sought to be searched as set forth below. Based on the facts provided herein, I believe probable cause exists that evidence of specified crimes, enumerated herein, will be found at the following business locations identified below:

**MYSTIK TREASURES, 116 North Franklin Street, Juneau, AK 99801**
**MYSTIK TREASURES, 1900 Crest Avenue, Suite 109, Juneau, AK 99801**

## APPLICABLE LAW

10.     As detailed in the following paragraphs, I believe there is probable cause the above referenced locations contain evidence of violations of 21 U.S.C. § 841(a)(1) Distribution of a Controlled Substance and Possession with Intent to Distribute a Controlled Substance, 21 U.S.C. § 846, Conspiracy, and Title 18 U.S.C. § 1956, Money Laundering.

## THE INVESTIGATION

11.     In November, 2012, DEA, the Alaska State Troopers (AST), the Juneau Police Department (JPD), and the Federal Bureau of Investigation (FBI) began a joint investigation into the distribution of spice by the 'MYSTIK TREASURES' retail store located at 116 North Franklin Street, Juneau, Alaska. Spice is a mixture of herbs and spices typically sprayed with a synthetic compound chemically similar to the psychoactive ingredients in marijuana. Although distributors market spice as "potpourri" or "incense" and label it "not for human consumption," it is intended to be smoked to mimic the effects of marijuana. Spice is usually sold in 1-2 gram packets, which are colorfully packaged and given pop-culture related brand names such as "Hysteria," "Scooby Snax," "WTF," "Kick Ass," and "Mind Eraser." The packaging for 'Spice' is, in many cases, similar in appearance to the colorful packaging commonly used in children's' candy such as 'Nerds,' 'Skittles,' and 'Lik-M-Aid Fun Dip,' as well as packaging commonly associated with powdered drinks like 'Kool-Aid' and 'Gatorade.'

12.     Since the manufacturing of spice often takes place in clandestine laboratories in the United States and abroad, spice often contains a mixture of random chemicals that then produce random and unpredictable effects on consumers. In a single clandestine laboratory, the same batch of herbal material could be sprayed with different chemicals but packaged under the same brand name. Therefore, a consumer could purchase two packets of spice under the same brand name but receive different chemicals, which then produce different hallucinogenic experiences for the consumer.

13.     During this and other investigations, I have learned that spice distributors typically use coded language in talking about spice, often avoiding use of the term "spice." Based on my training and experience, I know that drug traffickers often use coded language when talking about illegal drugs in order to avoid detection by law enforcement. Spice distributors know that spice is illegal and try to work around current state and federal drug laws by referring to spice as "incense" or "potpourri" that is not "smoked" but "smelled" or "tasted." Spice distributors also label the drug as "not for

human consumption" on the packaging in an attempt to avoid criminal liability. However, it is common knowledge among both sellers and users of spice that the drug is indeed smoked through a pipe or rolled up in paper like marijuana and the intended effect is a "high" or altered state of mind.

14. On October 23rd, 2012, your Affiant and Alaska State Trooper Sergeant Christopher Russell debriefed DEA CS-12-141067, hereafter referred to as the CS regarding the suspected sales of synthetic cannabinoids from 'MYSTIK TREASURES.' The CS stated he/she previously visited this store with an acquaintance. The CS stated his/her acquaintance purchased what the CS believed was 'Spice' or synthetic cannabinoids. During this debriefing, the CS stated he/she believed he/she could purchase 'Spice' from MYSTIK TREASURES.

15. On November 27, 2012, at the direction of S/A Rikk Rambo and AST Sgt. Christopher Russell, the CS purchased approximately 96.5 gross grams (packaged weight) of suspected synthetic cannabinoids from 'MYSTIK TREASURES.' Prior to this purchase, the CS was 'strip-searched' by Sitka Police Detective Kyle Ferguson and S/A Rikk Rambo with negative results for currency, weapons, or contraband. The CS purchased four containers of synthetic cannabinoids ('Spice') from an unidentified employee for $39.99 per container. These containers were labeled with the following 'product names' or monikers: "Blueberry 10X," "Strawberry 10X," "Pineapple Extreme 10X," and "Apple Pie Al A Mode 10X." The CS stated there were two 'MYSTIK TREASURES' employees present at the shop during this purchase. The CS stated the employee who sold him/her the 'Spice' was a younger (approximately 20 Years of Age) white female with dark brown hair. The CS stated the other store employee was a 30-40 year old white female with brown hair.

16. The 'Spice' purchased by Law Enforcement on November 27, 2012 was submitted to the DEA Laboratory by S/A Rikk Rambo. These Exhibits, as per the DEA Western Laboratory, exhibited a net weight of 8.1 grams. .S/A Rambo was notified by the DEA Western Laboratory that the chemical structure of the seized exhibits could not be immediately identified and would be submitted to the DEA Special Testing Unit for

further analysis. Your affiant has previous experience with suspected analog exhibits that were problematic, in relation to testing by DEA Laboratories. The inability of the laboratory to determine whether or not a seized substance is an analog controlled substance is directly related to the methodology under which analog controlled substances are manufactured and marketed. Specifically, manufacturers of these type of substances are aware of controlled substance scheduling laws in the United States, to include the specific, intricate chemical structures of these substances, and commonly attempt to chemically 'build' or 'structure' the chemical makeup of their products to a degree that alters the product to a degree that technically circumvents U.S. Laws. Further, for a laboratory to completely analyze and determine the makeup of a chemical compound, they must simultaneously utilize a chemically-like substance, or control group, to properly ascertain the exact chemical compound analyzed. In your affiant's experience, this is often difficult with analog controlled substances, as the substances are so rare and/or so 'new', in relation to the manufactures endeavors to create updated chemical structures to circumvent the products identification as a controlled substance, that control groups/standards for the exhibits to be analyzed are non-existent or extremely difficult to acquire.

17.     On March 20, 2013, Juneau Police Department Detective Lee Phelps and FBI Special Agent Anthony Peterson, acting in an Undercover Capacity (U/C), purchased 3 containers of suspected cannabinoids ('Spice') from 'MYSTIC TREASURES.' The 'product names' or monikers of the purchased containers of 'Spice' and the associated prices of each container are as follows: "Strawberry 10x at $39.95" "AK47 Acid Rain at $39.95" and "10X at $76.95." The purchase of the aforementioned containers was made from a store employee described by Det. Phelps and S/A Peterson as an adult female with "blue-colored hair." The U/C Investigators stated the employee initially told them the suspected 'Spice' they were purchasing was not for human consumption. However, when the U/C Investigators asked the employee about "the taste" of the 'Spice,' the employee stated the "Strawberry 10x" was "alright," but that she was unsure as to "how strong" it was. The employee then stated the "10X" was the most popular 'Spice' product sold by 'MYSTIK TREASURES,' and that she "really liked the flavor." The employee then corrected herself and used the word "smell." The employee subsequently

asked the U/C Investigators if they required a smoking pipe with their purchase. The U/C Investigators noted that smoking pipes were located in close proximity to the suspected cannabinoids ('Spice').

18. The exhibits containing suspected cannabinoids ('Spice') purchased by Law Enforcement on March 20, 2013, was submitted to the DEA Western Laboratory by your Affiant. The results from chemical analysis performed on the purchased exhibits yielded the following results: Exhibit 2.01, exhibiting the logo "Strawberry 10X" on the related packaging, was determined by the Western Laboratory to have a net weight of 1.9 grams. The chemical structure of the exhibit was designated as "unconfirmed" by the DEA Western Laboratory and submitted to the DEA Special Testing Laboratory for further analysis. Exhibit 2.02, exhibiting the logo "AK47 Acid Rain," and possessing a net weight of 4.9 grams, was identified as XLR11 1-(5-fluoro-pentyl)-3-(2,2,3,3-tetramethylcyclopropyl) indole. This substance is a schedule 1 controlled substance. Exhibit 2.03, exhibiting the logo "10x" and exhibiting a net weight of 1.7 grams, was identified by the Western Laboratory as XLR11 1-(5-fluoro-pentyl)-3-(2,2,3,3-tetramethylcyclopropyl) indole. This substance, as previously identified in Exhibit 2.02, is a schedule 1 controlled substance.

19. On May 15th, 2013, JPD Detective Lee Phelps and FBI Special Agent Anthony Peterson, acting in an undercover capacity, purchased one package of suspected cannabinoids labeled "10X" from 'MYSTIK TREASURES.' Det. Phelps and S/A Peterson described the employee as a white female who used the name "Jane" (LAST NAME UNKNOWN). This employee told Det. Phelps that the brand he purchased had "the strongest odor" of any of the other suspected cannabinoids sold by 'MYSTIK TREASURES.' She further stated the product was local known as "Gold."

20. S/A Rambo subsequently submitted the above exhibit to the DEA Western Laboratory with the following results: Exhibit 6, exhibiting a net weight of 3.2 grams, was identified by the Western Laboratory as XLR11 1-(5-fluoro-pentyl)-3-(2,2,3,3-tetramethylcyclopropyl) indole. This substance is a schedule 1 controlled substance.

21.     At the time your affiant submitted Exhibit 6 to the DEA Western Lab, he simultaneously submitted Exhibit 7 as well. Exhibit 7 was purchased by Det. Phelps prior to the initiation of the DEA criminal investigation of 'MYSTIK TREASURES' on February 28, 2012. This exhibit consisted of 3 baggies of suspected cannabinoids and was originally submitted to the Alaska State Crime Lab for analysis by the Juneau Police Department. The results of the Alaska State Lab analysis were negative in relation to findings for controlled substances as defined by Alaska State criminal codes. However, the laboratory did note that the submitted exhibit contained "AM2201." This substance, at the time of purchase by the Juneau Police Department, was not considered a controlled substance under Alaska State Law. This substance is, however, a Schedule 1 controlled substance under Federal Law.

22.     On September 14, 2013, the Juneau Police Department responded to a shooting incident at the Churchill Trailer Park, Trailer #19, Juneau, Alaska. Responding Juneau Police Officer S. Salisbury spoke with the occupants of Trailer #19. A female occupant of the trailer stated she was giving her young daughter a shower when she and other occupants of the trailer heard a shattering sound. The occupants subsequently located a bullet hole in one of the trailer's bedrooms that grazed the glass of a mirror in the hallway only inches from where the previously mentioned female occupant was bathing her daughter. A subsequent investigation by Juneau Police revealed the bullet was fired by Corena WILLARD, a 35 year old female. WILLARD admitted to firing the round, and made statements to Juneau Police Officers that were characterized as those made by an individual that was extremely paranoid and displaying extreme anxiety. WILLARD stated she was alone in her bedroom and "freaking out." WILLARD told investigators she didn't know why she was "freaking out." She stated she pointed a .32 caliber handgun at the backdoor of her residence and fired several rounds. WILLARD then admitted to using suspected "SPICE" the night before the incident. Pursuant to Alaska State Search Warrant 1JU-13-JEC1-SW, Juneau Police searched WILLARD'S residence and located and seized a package of "AK-47 ACID RAIN" suspected 'Spice' with smoking equipment on the headboard of the trailer's bedroom. WILLARD subsequently told JPD Sgt. D. Branson the seized package of suspected 'spice' was the substance she smoked the night before the shooting. JPD Detective L. Phelps subsequently examined

the "AK-47 ACID RAIN" pack and observed that the brand and its logo were exactly the same as the packaging and logo observed on evidence he previously purchased from MYSTIK TREASURES during a previous undercover buy. Further, Det. Phelps made note that the 'price-sticker' on the suspected 'spice' seized from WILLARD'S residence was the exact same type of 'price-sticker' exhibited on the suspected 'spice' he purchased from the MYSTIK TREASURES store located at 116 N. Franklin Street, Juneau, AK

24. On October 2nd, 2013, Juneau Police Department Investigator Lee Phelps, acting in an undercover capacity, entered the MYSTIK TREASURES retail business located at 116 North Franklin Street, Juneau, AK. Inv. Phelps met with a store employee described as a white male, approximately 5'6" tall and 160 pounds, with brown hair, in his late 20's/early 30's. Inv. Phelps stated he asked the employee about a package of suspected 'spice' that was contained in a small plastic container and the employee explained that that brand is unpopular and that "nobody ever comes back for that." Inv. Phelps then purchased a package of "10X" spice and a glass smoking pope. Due to the evolving/revisionist nature of analog drug trafficking, field 'test-kits' for these types of substances are unreliable, and in this case, the purchased substance will be submitted to the DEA Western Laboratory for analysis.

25. On October 3rd, 2013 at approximately 11:57 a.m., Officer J. Mahoney, acting in an undercover capacity, traveled to the "MYSTIK TREASURES" location at 1900 Crest Street, Suite #109, Juneau, AK, and purchased a package of suspected synthetic Cannabinoids ('SPICE') labeled as "10X." The price of this small packet of suspected 'SPICE' was $59.95 in U.S. Currency. Officer Mahoney also purchased an additional package of suspected 'SPICE' labeled as "Buddah Exotic Aroma Juice Fruit" for $36.95, a green glass pipe commonly used for smoking controlled substances, and a blue glass "one-hitter." The term "one-hitter" refers to one of the smallest smoking-pipes commonly available for commercial purchase and normally utilized as an item of drug paraphernalia for smoking controlled substances. The purchase of the substances is described as follows. Officer Mahoney chose the suspected 'spice' he planned to purchase, then asked the MYSTIK TREASURES employee, a female with "multi-colored hair," what pipe would be the best for the suspected 'spice' he purchased. The

MYSTIK TREASURES employee showed Officer Mahoney a box of smaller pipes, or "one-hitters." Officer Mahoney told the employee that the last time he purchased this type of pipe, it was not big enough to suit his purpose. Officer Mahoney then expounded on this statement and told the MYSTIK TREASURES employee that he wanted something bigger as he was going to utilize it to "put a little 'bud' *marijuana* in with the suspected 'Spice' he planned to purchase from the store. The employee then showed Officer Mahoney several glass pipes, of which Officer Mahoney chose a green glass model. The clerk then engaged in conversation with the U/C Officer that he translated as meaning the glass pipe would be adequate to suit his purposes in regard to smoking both Marijuana and the suspected 'Spice' simultaneously and intermingled. Officer Mahoney also purchased one of the "one-hitters" from a box labeled "Tasters." The total purchase for the two pipes and two small packages of suspected 'Spice' was $161.49. Officer Mahoney utilized a digital recorder during this purchase to memorialize the conversation. Due to the evolving/revisionist nature of analog drug trafficking, field 'test-kits' for these types of substances are unreliable, and in this case, the purchased substance will be submitted to the DEA Western Laboratory for analysis.

25. Your affiant determined through records obtained from the State of Alaska Department of Commerce, that the registered Agent for Mystik Treasures LLC, is Sarah Ann GRAVES. Your affiant further determined through this agency that there are two members accredited to the MYSTIK TREASURES LLC. These members are Sarah Ann GRAVES and Alexandra E. SANCHEZ. GRAVES is documented as owning 50 % of the MYSTIK TREASURES LLC and SANCHEZ is documented as owning 50 % as well. Your affiant further determined that MYSTIK TREASURES LLC has control and operates both MYSTIK TREASURES locations in Juneau, Alaska: 116 North Franklin Street and 1900 Crest Street, Suite #109.

## CONCLUSION

26. Based on the foregoing information, I believe there is probable cause that violations of 21 U.S.C. § 841(a)(1), Distribution of a Controlled Substance and

Page 15 of 16

Case 1:13-mj-00018-LCL   Document 1-1   Filed 10/04/13   Page 15 of 18

Possession with Intent to Distribute a Controlled Substance have occurred or are currently taking place.

27. Based on the foregoing information, I request search warrants at the following locations:

    a. MYSTIK TREASURES, 116 North Franklin Street, Juneau, AK

    b. MYSTIK TREASURES, 1900 Crest Street, Suite #109, Juneau, AK

Sworn to be fore me
10-4-13

**Signature Redacted**

United States Magistrate Judge

**Signature Redacted**

Rikk Rambo
Special Agent
Drug Enforcement Administration

SWORN AND SUBSCRIBED to before me this 4th day of October, 2013, at Juneau, Alaska.

**Signature Redacted**

HONORABLE LESLIE LONGENBAUGH
United States Magistrate Judge

ATTACHMENT A
PROPERTY TO BE SEIZED

1. Analog Substances, Analog Precursors, marijuana, plant/organic/inorganic media normally used in the preparation of 'Spice' (Cannabinoids), cutting agents, adulterants or materials, drug paraphernalia including but not limited to spoons, straws, hypodermic needles, strainers, tooters, mirrors, razor blades, vials, grinders, propane torches, glass pipes and other pipes used to smoke cannabinoids and marijuana, and stash containers.

2. United States currency, foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashier's checks;

3. Items evidencing the expenditure of drug related proceeds, namely; receipts, purchase agreements, vehicle titles, warranty applications, homeowners' or renters' insurance applications and claims, photographs and/or video recordings of luxury items, jewelry, expensive vacations;

4. Account statements, account summaries, credit card statements, banking deposit slips, handwritten notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications.

5. Safe deposit box keys and agreements and commercial storage locker keys or records.

6. Wire Transfer documents, receipts and handwritten notes containing wire service tracking numbers, amounts sent and intended pay-out locations.

7. Cellular telephones, caller ID units, fax machines, pagers, pre-paid long-distance cards, telephone answering machine tapes and computers (computers will not be searched without obtaining an independent search warrant following seizure).

8. Printed flight itineraries, passports including visas, airline tickets, airline ticket receipts, pre-printed airline luggage tags, handwritten notes containing airline confirmation codes, frequent flyer mileage plan cards and summaries, business cards from other areas, hotel receipts and car rental agreements and receipts.

9. Items tending to establish the use and/or possession of fraudulent identification documents, namely; birth certificates, Baptismal records/certificates, passports, driver's licenses, State issued identification cards, INS Resident Alien cards, Social Security cards

10. Equipment associated with and used for the protection and security of the controlled substance distribution/money laundering operation, namely; video surveillance cameras, video surveillance monitors, Internet "web-cams", motion sensors, trip-wire cameras and concealed listening/recording devices.

11. Items tending to establish the identity of the persons in control, as well as employees of the premises where the controlled substance is manufactured/distributed and/or where the money is stored, converted and/or prepared for transport, namely; utility company receipts, mortgage or rent receipts, canceled mail, envelopes, keys, telephone bills, charge card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, notebooks, photographs, videos, savings account passbooks, passports, diaries, notebooks, vehicle registrations and titles, land titles, escrow papers, legal documents, medical records, weapons with serial numbers, and papers denoting monetary amounts received from the distribution of cocaine, personal clothing including shoes, pants and shirts.

12. Items tending to establish and document sales of controlled substance and/or other controlled substances, or conspiracy to manufacture, distribute, and/or possess with the intent to distribute controlled substances and/or other controlled substances, namely; buyer lists, seller lists, ledgers, tally sheets, pay and owe sheets, price lists, notes and diaries.

13. Items tending to establish the identity of co-conspirators, namely; address books, papers and documents bearing handwritten notations of names and associated telephone numbers, photographs and videotapes.

14. Drug distribution paraphernalia, namely; scales, baggies, duct tape, vacuum sealers and vacuum sealer bags, drug ledgers, pay-owe sheets, customer lists, price lists and code sheets.

15. Weapons used, carried or intended to be used or carried during and in relation to any drug trafficking crime; to include pistols, revolvers, rifles, shotguns and machine-guns. The seizure of the weapons will be predicated on criteria including placement, concealment, ownership status and whether or not the weapon is loaded.